**Jonathan MENGES, Plaintiff,**

v.

**FREIGHT CAR SERVICES, INC., Local Union No. 579, United Automobile, Aerospace & Agricultural Implement Workers of America, and International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, Defendants.**

**No. 01–CV–2043.**

United States District Court, C.D. Illinois, Urbana Division.

March 25, 2002.

---

John H. Otto, Zimmerly, Gadau, Selin & Otto, Champaign, IL, for plaintiff.

Barbara L. Delanois, Davis & Delanois PC, Danville, IL, Stanley Eisenstein, Harold A. Katz, Katz, Friedman, Eagle, Eisenstein & Johnson, Chicago, IL, for defendants.

## *ORDER*

MCCUSKEY, District Judge.

This case is before the court for ruling on the Motion to Dismiss (# 27) filed by Defendant International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), the Motion to Dismiss (# 28) filed by Local Union No. 579, UAW (Local 579), the Mo-

tion for Summary Judgment (# 34) filed by Defendant Freight Car Services, Inc. (FCS), and the Motion to Strike Affidavit (# 36) filed by Plaintiff, Jonathan Menges. Following this court's careful review of the documents presented by the parties and the arguments of the parties, Defendants' Motions (# 27, # 28, # 34) are GRANTED. Plaintiff's Motion to Strike Affidavit (# 36) is also GRANTED.

## FACTS

On March 1, 2000, Plaintiff was terminated from his employment with FCS. Plaintiff was a member of Local 579, which had a collective bargaining agreement with FCS. Article V of the collective bargaining agreement set out the grievance and arbitration procedure for employees at FCS. Plaintiff had received a copy of the collective bargaining agreement on February 7, 1999. Following his termination, on March 3, 2000, Plaintiff filed a timely grievance through Local 579. On March 7, 2000, FCS denied Plaintiff's grievance at its first step. On March 14, 2000, a Section 4 conference was held pursuant to the collective bargaining agreement. Following the conference, FCS gave Local 579 its final position and determined that Plaintiff's discharge was just.

On March 20, 2000, Local 579 and FCS signed a timely Request for Arbitration Panel. The form stated that the $30.00 fee was enclosed. On April 25, 2000, the Federal Mediation and Conciliation Service sent a letter to Ken Bridges of FCS and Brian Mitchell, the UAW International representative who serviced Local 579 for the UAW. The letter included a panel of arbitrators from which an arbitrator could be selected. The letter stated that the panel of arbitrators was valid for one month from the date of the letter. The collective bargaining agreement stated that Local 579 was required to begin its first elimination of names from the panel of arbitrators within 14 calendar days. On

June 9, 2000, Brian Mitchell signed a form which stated that eight listed grievances, including seven where the union had provided an intent to arbitrate, were withdrawn. Plaintiff's grievance was included on the list.

On February 26, 2001, Plaintiff filed his Complaint (# 1) against FCS and Local 579. On June 5, 2001, Plaintiff filed his First Amended Complaint (# 21) against FCS, Local 579 and the UAW. Plaintiff alleged that, "[o]n August 28, 2000, Plaintiff was told by his shop steward, Rich Ingram, that the arbitration was dropped because the Local did not pay its share of the arbitrator's fee." Plaintiff alleged that FCS terminated his employment without just cause, in violation of the collective bargaining agreement. Plaintiff also alleged that the UAW and Local 579 did not fairly represent Plaintiff because they did not pay the union's share of the arbitration fee to enable his grievance to be decided by an arbitrator and because they failed to pursue arbitration of Plaintiff's discharge.

On June 14, 2001, the UAW filed a Motion to Dismiss (# 27) and Local 579 also filed a Motion to Dismiss (# 28). Both the UAW and Local 579 argued that Plaintiff's Complaint was barred by the applicable six month statute of limitations and was not timely. The UAW and Local 579 adopted Declarations which had been filed in support of Local 579's earlier Motion to Dismiss. Also on June 14, 2001, a Rule 16 conference was held before Magistrate Judge David G. Bernthal. The court set a schedule for limited discovery on the issue of the statute of limitations. On July 12, 2001, Judge Bernthal determined that, because the Motions to Dismiss relied upon facts outside the complaint, the court would deem the motions as motions for summary judgment.

On August 16, 2001, FCS filed a Motion for Summary Judgment. FCS attached affidavits and excerpts from depositions in

support of its Motion. This documentation showed the following facts. Robert Buford is Local 579's bargaining chairman at FCS. Buford was present on June 9, 2000, when Mitchell withdrew Plaintiff's case from arbitration. Buford did not agree with Mitchell's decision. Buford testified that, about one week later, he met with Plaintiff and told him that his case had been dropped by Mitchell. Buford testified that he told Plaintiff he did not understand in detail why Mitchell withdrew the case. Buford stated that Plaintiff said, "I'm suing. I'm suing. I ain't got nothing against you Bob. I'm suing."

Edward Barney is the president of Local 579. Barney testified that Buford called him and told him Plaintiff would be coming to see him. Priscilla Derrickson is Barney's secretary. Derrickson stated that Plaintiff came to the union hall to see Barney in mid to late June 2000. According to Derrickson, Plaintiff asked to see Barney and, while he was waiting, told her that he was going to sue the union and that the union sold him down the drain. Barney testified that, when he met with Plaintiff that day, Plaintiff accused him of screwing up the arbitration by not getting the check there on time and asked him what he was going to do about it. According to Barney, he told Plaintiff that Plaintiff could talk to Brian Mitchell and that "there's not much we can do about it." Richard Ingram was a committeeman for Local 579. He was involved in Plaintiff's grievance but stated that, after the grievance was denied by FCS, "basically it was out of my hands."

Plaintiff testified at his deposition that he was concerned, prior to Memorial Day 2000, about the amount of time his grievance was taking. Plaintiff stated that he had heard rumors "[o]f the grievance being dropped" but was told by Ingram, in late June, that the rumors were not true. Plaintiff testified that, when he met with Buford, Buford told him "it was being handled by the hall." According to Plaintiff, Buford also told him he did not "have any specifics" and referred Plaintiff to Barney. Plaintiff testified that Buford did not tell him the grievance was withdrawn. However, Plaintiff also stated that he "probably did" tell Buford he was going to sue the union. He testified that the reason he was talking about suing the union was because they would not communicate with him or give him a definite answer.

Plaintiff testified that he did go talk to Barney at the union hall around the end of June 2000. Plaintiff testified that he may have told Derrickson that the union was "selling" him down the drain. Plaintiff testified that, when he saw Barney, he told Barney that he "was hearing lots of rumors about things." According to Plaintiff, Barney said, "I'll have to get back with you. If you have any questions, you need to get with Brian Mitchell." Plaintiff testified that Barney said he did not know "if Brian is done with it." Plaintiff stated that Barney told him "Brian Mitchell had been handling it and I'd have to get with Brian." Plaintiff testified that he asked Barney for something in writing and Barney told him, "I don't have to give you anything in writing. If you need to get an attorney, get an attorney." Plaintiff stated that he responded, "[i]f I have to get an attorney, I have to." Plaintiff testified that he made one telephone call to Mitchell, which was not returned.

Plaintiff testified that he "figured they'd still mail something out." He was involved in a motorcycle accident on July 6, 2000. He testified he was taking "pretty heavy" pain medication after the accident until "roughly probably the 20th of August." Plaintiff testified that he then contacted Ingram and that's when he found out that his grievance was withdrawn. On February 18, 2001, just before Plaintiff filed his Complaint, Plaintiff asked Ingram to sign

a statement. This statement said that Ingram told Plaintiff on June 26, 2000, that his case was going to arbitration. The statement also said that, on August 28, 2000, Ingram told Plaintiff that the union had withdrawn his grievance "due to the check for arbitration not being received on time."

On September 14, 2001, Plaintiff filed his Response to Local 579's Motion to Dismiss (# 37) and his Response to FCS's Motion for Summary Judgment (# 38). Plaintiff argued that there are fact issues regarding when Plaintiff knew or should have known that his grievance had been dropped.

On October 1, 2001, FCS filed its Reply (# 40). FCS noted that Ingram testified at his deposition that he would never have told anybody after June 9, 2000, that Plaintiff's grievance was going to arbitration because Ingram learned on June 9, 2000, that Plaintiff's grievance was dead. Ingram also testified that the statement he signed for Plaintiff was unsworn and that the June 26, 2000, date in the statement was not correct. Ingram also testified that he was not sure what date in August he told Plaintiff that the union had withdrawn the grievance. On October 3, 2001, the UAW and Local 579 filed a Reply (# 42). The UAW and Local 579 argued that the undisputed facts show that, because Plaintiff testified that he was getting the runaround and that the union was stonewalling him, Plaintiff reasonably was placed on notice of the accrual of his cause of action against the union.

## ANALYSIS

### I. MOTIONS FOR SUMMARY JUDGMENT

#### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, this court is not required to draw every conceivable inference from the record in favor of the non-movant, only those inferences that are reasonable. *Chapple v. National Starch & Chem. Co.*, 178 F.3d 501, 504 (7th Cir.1999). The "non-moving party must be able to point to record evidence that would reasonably permit the fact finder to find in its favor on a material question." *Chapple*, 178 F.3d at 504, *citing Waldridge*, 24 F.3d at 920. Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 394 (7th Cir.1998).

### B. STATUTE OF LIMITATIONS

Under § 301 of the Labor–Management Relations Act of 1947 (LMRA) (29 U.S.C. § 185), an employee may bring an action charging an employer with violating the collective bargaining agreement and charging the union with violating its duty of fair representation by mishandling the result-

ing grievance. *Sosbe v. Delco Elec. Div. of General Motors Corp.*, 830 F.2d 83, 84 (7th Cir.1987), *citing Vaca v. Sipes*, 386 U.S. 171, 186–87, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). "It is well settled that an essential element of a Section 301 action against an employer is a showing that the union has breached its duty to fairly represent." *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 913 n. 2 (7th Cir.1999), *citing United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 61–62, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981). "This is because normally, as here, where the collective bargaining agreement provides for final binding arbitration of certain labor disputes, such decisions (or the lack thereof) will be vacated only where the union has failed to fairly represent the union member." *Christiansen*, 178 F.3d at 913 n. 2. This kind of claim is considered a "hybrid" § 301 claim. *See Christiansen*, 178 F.3d at 913 n. 2.

Plaintiff's claim here is such a hybrid § 301 complaint. *See Sosbe*, 830 F.2d at 84. It is well settled that a six month limitations period applies to hybrid claims under § 301 of the LMRA. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 169–72, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Pantoja v. Holland Motor Express, Inc.*, 965 F.2d 323, 326–27 (7th Cir.1992). It is also well settled in the Seventh Circuit that the six month period begins to run "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [violation]." *Christiansen*, 178 F.3d at 914, *quoting Metz v. Tootsie Roll Indus., Inc.*, 715 F.2d 299, 304 (7th Cir.1983), *cert. denied*, 464 U.S. 1070, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984).

In hybrid claims under § 301, the union member is attacking both the employer and the union. *Pantoja*, 965 F.2d at 327. Here, there is no dispute that Plaintiff knew that FCS allegedly violated the col-

lective bargaining agreement on March 1, 2000, the date Plaintiff's employment was terminated. The more difficult task in this case is determining when Plaintiff knew, or should have known, that the union breached its duty of fair representation. *See Pantoja*, 965 F.2d at 327. That would be the date his full hybrid claim accrued. *See Pantoja*, 965 F.2d at 327. In making that determination, there cannot be any serious dispute that the date the union allegedly violated its duty of fair representation was June 9, 2000, when it withdrew its request for arbitration of Plaintiff's grievance. No further action was taken by the union after that date to pursue Plaintiff's grievance against FCS. Therefore, it appears that the six month statute of limitations began to run on June 9, 2000, and ended well before Plaintiff filed his original Complaint (# 1) on February 26, 2001.

However, Plaintiff argues that summary judgment should not be entered in this case based upon the statute of limitations. Plaintiff argues that he did not get a definite answer about his grievance until August 28, 2000, the date Plaintiff claims he was told by Ingram that the grievance had been dropped. Plaintiff contends that there is clearly a genuine issue of material fact regarding when he knew or should have known that his grievance was dropped by the union. Plaintiff also argues that the discovery rule and the doctrine of equitable estoppel toll the running of the statute of limitations in this case.

This court notes that it must accept Plaintiff's version of the facts as true in ruling on the motions for summary judgment. In addition, this court cannot make credibility determinations at this point in the proceedings. However, accepting Plaintiff's version of the facts as true, this court concludes that Plaintiff clearly "should have discovered" that his griev-

ance was withdrawn by the union well before August 28, 2000.

■ A § 301 cause of action accrues when the plaintiff discovers or in the exercise of reasonable diligence should have discovered that no further action would be taken on his grievance. *Chapple*, 178 F.3d at 505; *Salmanis v. American Postal Workers Union, AFL–CIO*, 2001 WL 219650, at *3 (N.D.Ill.2001). "[A] claim against a union can accrue even though the union never officially notifies the plaintiff that it will not do what the plaintiff requested." *Pantoja*, 965 F.2d at 327, *citing Metz*, 715 F.2d at 304; *see also Christiansen*, 178 F.3d at 915. Therefore, a union does not need to officially notify an employee of its intention to take no action in order for the cause of action to accrue. *Yario v. International Bhd. of Elec. Workers Local 134 of Chicago*, 1995 WL 417535, at *4 (N.D.Ill.1995). A plaintiff should not presume a duty on the part of the union to contact him and notify him of the breach when, in actuality, the duty to exercise reasonable diligence rests with the plaintiff. *See Sizer v. Rossi Contractors*, 2000 WL 116081, at *3 (N.D.Ill.2000), *citing Metz*, 715 F.2d at 304. Prolonged inaction by the union is sufficient to give a diligent plaintiff notice that the union has breached its duty of fair representation. *Pantoja*, 965 F.2d at 327. "The determination of the accrual date is an objective one: 'the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue.'" *Salmanis*, 2001 WL 219650, at *4, *quoting Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir.1994). The accrual date is the date on which the plaintiff should reasonably have been aware

that he had been wronged. *Chapple*, 178 F.3d at 505 n. 4.

■ Based upon the case law cited, the date Plaintiff claims that he was notified by Ingram that his grievance was withdrawn is not the date his claim accrued. The actual accrual date is the date when Plaintiff should reasonably have been aware that he had been wronged. In this case, Plaintiff testified that he was concerned, prior to Memorial Day 2000, about the amount of time his grievance was taking. He also testified that he heard "rumors" in June 2000 that his grievance had been dropped. He testified that, in late June, Ingram told him that the rumors were not true. However, Plaintiff also talked to two higher ranking officials of Local 579, Buford and Barney. Plaintiff testified that Buford did not tell him that the grievance had been withdrawn but told him he did not "have any specifics" and referred him to Barney.[1] Plaintiff testified that he "probably did" tell Buford he was going to sue the union because they would not communicate with him or give him a definite answer. Plaintiff also testified that, when he talked to Barney, Barney said, "I'll have to get back with you. If you have any questions, you need to get with Brian Mitchell." Plaintiff testified that Barney said he did not know "if Brian is done with it." Plaintiff stated that Barney told him "Brian Mitchell had been handling it and I'd have to get with Brian." Plaintiff testified that he asked Barney for something in writing and Barney told him, "I don't have to give you anything in writing. If you need to get an attorney, get an attorney." Plaintiff stated that he responded, "[i]f I have to get an attorney, I have to."

---

1. This court recognizes that Buford testified that he did, in fact, inform Plaintiff that his grievance had been withdrawn in June 2000.

However, this court is accepting Plaintiff's version of the facts for purposes of ruling on the motions for summary judgment.

This court concludes that, following this conversation with Barney, a reasonable person would recognize that the union was not pursuing his grievance and legal action was necessary. Based upon his own testimony, Plaintiff was aware that the union was giving him the run-around and was not giving him any answers. Because of that, Plaintiff had already told Buford that he was planning on suing the union and told Derrickson the union was "selling him down the drain." Plaintiff also should have been aware that, based upon the collective bargaining agreement, the time to select an arbitrator had passed. In addition, Plaintiff testified that Barney told him Barney would not give him anything in writing and that if he needed to get an attorney he should get an attorney. At that point, Plaintiff "did not need formal notification to realize that the union would not help him and that he needed to bring suit himself." See Pantoja, 965 F.2d at 327.

At the very least, Plaintiff had certainly been informed that he needed to contact Brian Mitchell to find out the status of his grievance. Based upon Plaintiff's account of his conversation with Barney, Plaintiff had no reasonable basis to "figure[ ] they'd still mail something out." Plaintiff testified that he called Mitchell once following his conversation with Barney and his call was not returned.[2] Plaintiff testified that his motorcycle accident happened a short time later, on July 6, 2000, and now argues that the accident stopped him from continuing his inquiry. However, while Plaintiff testified that he was taking pain medication and was going to therapy on a regular basis, his testimony fell far

short of establishing that the motorcycle accident made him mentally incompetent and incapable of continuing his inquiries. This court concludes that Plaintiff has not shown that he exercised due diligence in determining whether the union had stopped pursuing his grievance.

Plaintiff relies on Salmanis [3] and argues that he made inquiries of the union and was given the wrong information. This court does not agree. In Salmanis, it was unclear when the injury occurred. The court noted that the employer's "arguments regarding plaintiff's diligence have to do with inquiries she did not make from July 1995 through October 1999, but for most of that period [the employer] has not explained how such inquiries would have led her to discover an injury that had yet to occur." Salmanis, 2001 WL 219650, at *4. The court also stated that the plaintiff made inquiries and was specifically told that the matter would be resolved later. Salmanis, 2001 WL 219650, at *4.

Here, by contrast, the date of the injury cannot seriously be disputed. The undisputed facts show that the union withdrew its request for arbitration of Plaintiff's grievance on June 9, 2000. Following that date, accepting Plaintiff's version of the facts as true, Plaintiff heard rumors that his grievance was dropped and could not get any definite answers from the union. In late June 2000, Plaintiff was told by Barney that he should contact Mitchell and that he should get an attorney if he needed to get an attorney. Based upon Plaintiff's version of the facts, this court concludes that Plaintiff was given the "run-around" rather than wrong information. This court

---

2. Plaintiff testified that Mitchell may have tried to call him at home after his accident in which case he would not have received the call because he was staying with his mother.

3. This court notes that Plaintiff has cited Salmanis v. American Postal Workers Union,

AFL–CIO, 2001 WL 214187 (N.D.Ill.2001). However, in that case, a newer and more complete opinion was issued as Salmanis v. American Postal Workers Union, AFL–CIO, 2001 WL 219650 (N.D.Ill.2001). Therefore, this court is citing to the newer opinion.

concludes that Plaintiff should reasonably have been aware that he had been wronged at the time he talked to Barney in late June 2000.

■ Plaintiff has also attempted to invoke the "discovery rule" and the doctrine of equitable estoppel, relying on *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir.1990), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). This court has already concluded that Plaintiff should have discovered that he was wronged in late June 2000. Therefore, the discovery rule does not help him. This court also notes that the Seventh Circuit rejected the plaintiff's invocation of the doctrine of equitable estoppel in *Chapple*, a similar case involving the issue of when a § 301 hybrid claim accrued. In *Chapple*, the Court noted that, under the doctrine of equitable estoppel, "a defendant who conceals vital information about the existence of a plaintiff's claim or makes representations to the plaintiff causing [him] to delay bringing the claim, can be estopped from relying on the statute of limitations as a defense." *Chapple*, 178 F.3d at 506. Equitable estoppel applies where a defendant "takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." *Yario*, 1995 WL 417535, at *5, *citing Cada*, 920 F.2d at 450. This court concludes, as did the Court in *Chapple*, that Plaintiff has not shown that Defendants took any affirmative steps to conceal from Plaintiff his cause of action. *See Chapple*, 178 F.3d at 507. In fact, Barney basically advised Plaintiff to get an attorney in late June 2000.

Moreover, the Seventh Circuit has noted that it has attempted to keep the rules for computing time in *DelCostello* cases as simple as possible. *Pantoja*, 965 F.2d at 329. Courts have noted that extension of the time allotted would be inconsistent with the concern for rapid resolution of labor disputes articulated by the Court in *DelCostello*. *Sosbe*, 830 F.2d at 87–88; *see also Yario*, 1995 WL 417535, at *5. This court agrees with the court in *Yario* that "delay in the filing of suits and the adoption of equitable estoppel to provide a basis for the delay 'might undercut the certainty and prompt resolution that the Supreme Court hoped to achieve in *DelCostello*.'" *Yario*, 1995 WL 417535, at *6, *quoting Bonds v. Coca–Cola Co.*, 806 F.2d 1324, 1329 (7th Cir.1986).

For all of the reasons stated, this court concludes that Plaintiff's cause of action accrued in late June 2000. Therefore, Plaintiff's Complaint (# 1), filed on February 26, 2001, was not timely and is barred by the applicable six month statute of limitations.

## II. MOTION TO STRIKE

FCS filed the Affidavit of Christine Spears (# 33) in support of its Motion for Summary Judgment. In her Affidavit, Spears stated that she was a passenger on Plaintiff's motorcycle on July 6, 2000, and was severely injured in the motorcycle accident. Spears stated that, prior to the accident, in mid to late June 2000, Plaintiff often told her that he was going to sue the union and FCS. Spears stated that Plaintiff said he believed he had a good lawsuit against the union and FCS and would be "rich" when he was finished suing them.

On September 14, 2001, Plaintiff filed a Motion to Strike Affidavit of Christine Spears (# 36). Plaintiff noted that Defendants did not list Spears in their initial disclosures as an individual likely to have discoverable information. Plaintiff argued that, if Spears had been so listed, "he could have taken her deposition to explore the basis of her affidavit and attempt to impeach statements made in it." Plaintiff argued that he was prejudiced by the filing of Spears' Affidavit following the limited

discovery allowed in the case. Plaintiff asked this court to strike the Affidavit. Plaintiff also filed his own Affidavit. In his Affidavit, Plaintiff stated that, as a result of the motorcycle crash, Spears became hostile to him. Plaintiff stated that Spears' statements in her Affidavit were not true.

On September 27, 2001, FCS filed a Response to the Motion to Strike (# 39). FCS noted that Spears was discussed during Plaintiff's deposition. FCS further stated that its first contact with Spears was on August 7, 2001, shortly before its Motion for Summary Judgment was filed. The UAW and Local 579 also addressed the issue of Spears' Affidavit in their Reply. They noted that Plaintiff could have asked to take Spears' deposition prior to this court's ruling on the motions for summary judgment pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

This court notes that it did not consider or rely on any of the statements in Spears' Affidavit in ruling on the motions for summary judgment. Accordingly, Plaintiff's Motion to Strike (# 33) is GRANTED.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion to Strike Affidavit of Christine Spears (# 36) is GRANTED.

(2) The UAW's Motion to Dismiss (# 27), which has been converted to a Motion for Summary Judgment, is GRANTED.

(3) Local 579's Motion to Dismiss (# 28), which has been converted to a Motion for Summary Judgment, is GRANTED.

(4) FCS's Motion for Summary Judgment (# 34) is GRANTED.

(5) Judgment is entered in favor of Defendants and against Plaintiff. This case is terminated. The parties shall be responsible for their own court costs.